UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

DEMETRI D BEACHEM *et al.*,

Defendants.

CAUSE NO. 1:17-cr-07 DRL-SLC

<u>OPINION & ORDER</u>

After members of the 2500 gang fired fifty shots into a rival gang's home, the government charged Demetri Beachem, William Beamon, Kyombe Bolden, and Ronnie Burrus with multiple crimes in an eighteen-count indictment.[1] Each one pleaded guilty to two counts of attempted assault with a dangerous weapon in aid of racketeering, *see* 18 U.S.C. § 1959(a)(6), one count of assault with a dangerous weapon in aid of racketeering, *see* 18 U.S.C. § 1959(a)(3), and three counts of discharging a firearm during and in relation to a crime of violence, *see* 18 U.S.C. § 924(c). The defendants collectively objected to both the attempted murder guideline and obstruction of justice enhancement used in their presentence reports. The court held an evidentiary hearing and permitted briefing to facilitate the following rulings to aid the parties for their individual sentencing hearings.

FACTUAL BACKGROUND

"2500" is a Fort Wayne enterprise or gang engaged in drug and firearm trafficking (ECF 366 at 15).[2] The group is closely associated with the "Grit Gang" in Bloomington, Indiana (ECF 366 at

---

[1] Not each defendant was charged with each count in the indictment, but in conjunction there were eighteen counts.

[2] Because each defendant admitted to the same facts in their plea hearings, the court cites to only one plea hearing as a record reference instead of citing to all four. The Oxford English Dictionary recognizes the pejoration of the word "gang" only in its eighth definition, *see Gang, Oxford English Dictionary* (3d ed. 2013), and members today often refer to their associations as groups or identified neighborhoods, such as 2500 here, rather than as gangs. The court consequently uses the word only when clarity demands.

15). Given their close association, the court refers to "2500" collectively for 2500 and Grit Gang (*see* ECF 366 at 15-16).

Each defendant was a member of 2500. The group had a history of violent incidents or shootings against rival gangs, including the Fort Wayne gang "Mafia" (ECF 366 at 16; ECF 356-1 at 6-7). One member (Devonte Houston), for instance, called this conflict with Mafia a "war." Fellow members loyally protected each other because the failure to protect others might show weakness or result in an individual's dismissal from the group (ECF 360 at 105, 117).

As part of its identity and influence, 2500 members uploaded music videos on the Internet via YouTube that taunted rival Mafia members and glamorized 2500's lifestyle (ECF 366 at 17; ECF 360 at 111, 124, 138). The 2500 group used the name "Stack Money" for its music (ECF 356-1 at 9). All the defendants participated in these music videos (ECF 366 at 17), with Messrs. Beamon, Bolden, and Burrus being most involved (ECF 360 at 165).

In these videos, 2500 members glamorized the violent attack on "ops," or opposition gang members (ECF 366 at 17; ECF 360 at 21; ECF 356-1 at 6). In the video entitled "Zan with the Lean," for instance, Messrs. Beamon, Bolden, and Burrus recited lyrics directing that opposition members be killed with gunfire as revenge for the murder of Demarcus "Scooby" Adams, 2500's former leader who died during an altercation with Mafia members (ECF 366 at 17-18, 22; ECF 360 at 48, 139). Mr. Beachem was also in that video, though he isn't seen reciting the lyrics (ECF 366 at 18). The participants in the videos, including Mr. Beachem, at times mimicked trigger fire with their hands (ECF 360 at 116, 127); and many videos featured actual firearms, including those brandished by Messrs. Beamon and Burrus (ECF 360 at 117, 119, 133-34). Group members wore attire with references to 2500 or Scooby (ECF 360 at 134; ECF 356-1 at 9). Some had tattoos signifying their group membership (ECF 360 at 120).

The 2500 gang elevated shooters and moneymakers to leadership positions, with the most

violent receiving the greatest amount of respect (ECF 366 at 31; ECF 360 at 106). For instance, Mr. Beamon had a history of violence with rival Mafia members. Mr. Beamon admitted during a recorded conversation that he shot a Mafia member and his girlfriend in 2012, in which he "saw them fall," with Mr. Adams present (ECF 366 at 18-19). Mr. Beamon scoffed at his rival's weakness when he failed to respond with violence, and he said he wanted to finish the job by killing his rival's wounded girlfriend (ECF 366 at 19). Mr. Beamon later admitted he tried to shoot at another rival on a different occasion, but his gun jammed (ECF 366 at 19).

Violence between 2500 and Mafia stemmed from deaths in both their ranks. Mafia believed that Mr. Adams killed one of its own, and Mafia retaliated by killing him in 2014. The deaths sparked retaliatory violence between the groups, exacerbated by the posting of threatening videos (ECF 366 at 22; ECF 360 at 108, 110; *see* ECF 360 at 46). The shooting at issue today is an extension of these vendettas.

On October 4, 2014, the defendants and other 2500 members planned to celebrate their former leader's birthday posthumously with a party. All four defendants and other 2500 members were at the mall in the early evening, where they viewed insulting social media videos about Mr. Adams and 2500 posted by Mafia members on territory claimed by 2500—a certain neighborhood block in Fort Wayne (ECF 366 at 21-22; ECF 360 at 26; ECF 356-1 at 8-10). 2500 members viewed this as an act of disrespect (ECF 356-1 at 11; ECF 360 at 55).

The 2500 members were angered by the videos and departed from the mall in four separate vehicles, following their usual practice of keeping at least one person with a gun permit in each car (Ex. 2 at 3 (Devonte Houston saying in recorded interview that shooting was motivated by derogatory social media comments about Mr. Adams); ECF 366 at 22-23, 27; ECF 356-1 at 11-12).[3] This enabled

---

[3] The government submitted the transcript of Devonte Houston's recorded statement at the evidentiary hearing as Exhibit 2.

the shooters or enforcers to engage in violence while the gun permit holders could still claim possession of the guns in the event of a traffic stop (ECF 366 at 23; ECF 360 at 27).

The defendants and the other 2500 members looked for the rivals in the video (ECF 366 at 23; ECF 360 at 153-54[4]; ECF 356-1 at 26), though at least some members of the group (including Messrs. Bolden and Beamon) met at another house before heading to the Caroline and Suttenfield block (ECF 356-1 at 12-13). By then, it was dark outside (ECF 356-1 at 15). They attempted to locate these individuals at a residence near their territory; but not finding them, they then congregated at the Caroline and Suttenfield block (ECF 366 at 23). Two rival Mafia members, J.S. and F.B. (both of whom appeared in the social media videos), exited a house on Suttenfield (ECF 366 at 23). Mr. Beachem and these individuals exchanged comments as they tried to confirm their identity, and Mr. Beachem announced he was from "the Block" and opened fire (Ex. 2 at 3). All four defendants (and two others) opened fire on J.S. and F.B (ECF 366 at 12-13, 21, 23; ECF 360 at 98, 102, 150).

The defendants collectively fired approximately 50 rounds toward the rival gang members, with Mr. Beachem firing the first shot and each defendant firing multiple rounds (ECF 366 at 24, 27). Mr. Beamon later said some members of the group used .40 caliber weapons to be more lethal (ECF 360 at 56). Messrs. Beachem and Burrus had laser lights attached to their guns focused on the victims during the shooting (ECF 366 at 27, 30; ECF 360 at 101, 106-07). Their gunfire hit two houses and a vehicle (ECF 366 at 23). The victims had to take cover (ECF 360 at 100).

There were people in both homes at the time, and victim S.E., a 16-year-old, was hit in the finger (ECF 366 at 11-12, 23). There were juveniles in the neighboring residence, and one girl in particular barely escaped injury, with gunfire narrowly missing her head (ECF 366 at 23; ECF 360 at 103). Devonte Houston later said in recorded interview that the shooting was motivated by derogatory

---

[4] Devonte Houston said "[t]hat's why [they] really went to the block" (Ex. 2 at 2; *see also* ECF 360 at 153-54).

social media comments about Mr. Adams (ECF 360 at 99-100), and Sierra Brown[5] acknowledged that members were angered by the video (ECF 356-1 at 11-12).

Immediately after the shooting, several 2500 members drove to a nearby liquor store to be seen on camera for an alibi (ECF 366 at 27; ECF 360 at 102). This group included Messrs. Beamon and Bolden (ECF 366 at 24; ECF 356-1 at 16-17), and they were wearing clothing identifying them as 2500 members. An "op" at the liquor store made derogatory comments about 2500, and Messrs. Beamon and Bolden and others (including Dyzel Bowen) proceeded to beat this person up (ECF 366 at 24; ECF 360 at 56, 102-03; ECF 356-1 at 17). Mr. Beamon pulled a gun out on the individual (ECF 360 at 103).

Law enforcement later stopped several vehicles with 2500 members and recovered firearms that were matched to multiple shell casings recovered at the shooting scene (ECF 366 at 24-25). They stopped a Mercury Milan, with driver Ms. Brown and passengers Messrs. Beamon and Bolden (ECF 366 at 25). They recovered Ms. Brown's loaded handgun (a Glock) from the glove box directly in front of Mr. Beamon, which was used in shooting, and on the floor, they found a high capacity magazine for the gun (ECF 366 at 25; ECF 356-1 at 21). Mr. Beamon had encouraged Ms. Brown—who had a gun permit[6]—to buy the gun a few weeks before the shooting, saying it would be good for her personal protection, and he also encouraged her to buy the 30-round extension (ECF 356-1 at 21-23). Law enforcement located Mr. Bolden's gun (a Ruger) in the map pocket behind the driver's seat, and Mr. Bolden later pleaded guilty in a separate case to possessing the gun (ECF 366 at 25). Ms. Brown was able to claim possession of her own gun, so Mr. Beamon was never charged with unlawful possession of a weapon (ECF 356-1 at 25-26).

Officers also stopped Mr. Beachem's Pontiac Bonneville, with this vehicle occupied by Mr.

---

[5] Sierra Brown was Mr. Beamon's girlfriend at the time of the offense.

[6] Mr. Beamon didn't have a gun permit (ECF 356-1 at 23-24).

Beachem and Shiquan Guy, Calvin Keys, and Dyzel Bowen (ECF 366 at 25). Mr. Beachem had his loaded handgun in the glovebox (ECF 366 at 25). In a subsequent controlled buy, a confidential source purchased another firearm used in the shooting from Mr. Beamon (ECF 366 at 25).

Mr. Burrus' car wasn't stopped in the immediate aftermath, though the occupants of that vehicle feared a stop and tossed guns out of the car (ECF 366 at 26). Mr. Burrus later confirmed that he was almost involved in another shooting with Mafia members at another liquor store later that same night (ECF 366 at 30). He said he would have shot at them had the Mafia members not been armed (Ex. 1 at 38; ECF 360 at 38).

After Mr. Bolden had been arrested on his unlawful possession of a weapon charge, some members of 2500, including Messrs. Burrus and Beamon, tried to convince Mr. Beamon's girlfriend, Ms. Brown, to go to the police station and falsely claim ownership of Mr. Bolden's weapon that was seized from her car (ECF 366 at 27-29; ECF 360 at 49; ECF 356-1 at 28).[7] Mr. Burrus, who was directing this effort alongside an informant, encouraged Ms. Brown to use a notarized statement to retrieve the guns (Ex. 1 at 22; ECF 366 at 31; ECF 360 at 30; ECF 356-1 at 29). They hoped that this would result in Mr. Bolden's release from jail for the unlawful possession of firearms charge (Ex. 1 at 23; ECF 366 at 31; ECF 360 at 31). They were also nervous about fingerprints on these guns because members often shared guns for mutual protection and their fingerprints would be on them (Ex. 1 at 26; ECF 366 at 31; ECF 360 at 34). Though the group called Mr. Bolden while they were discussing their plans to have Ms. Brown retrieve the gun, he seems not to have vocalized his support for this plan (ECF 366 at 31; ECF 360 at 36, 81, 146). Mr. Bolden said only at one point that he was "solid," which law enforcement interpreted to mean that he wouldn't say anything incriminatory (Ex. 1 at 29; ECF 360 at 37). Mr. Burrus opined that Ms. Brown had only three days ("seventy-two hours") to

---

[7] Ms. Brown also wanted to claim ownership of her own gun, which was in the custody of law enforcement (ECF 356-1 at 28).

claim ownership of the gun before it went to court (Ex. 1 at 55; ECF 360 at 34).

Mr. Burrus asked an informant to coach Ms. Brown on how to go about retrieving the gun, worrying that she might make a mistake (Ex. 1 at 62; ECF 366 at 32). Messrs. Beamon, Bolden, and the informant met Ms. Brown at the police station, and Ms. Brown talked to someone at the front desk about getting her guns back (ECF 366 at 32).

During their conversations with Ms. Brown, Mr. Burrus said he wasn't leaving Fort Wayne until he "[caught] a body" (Ex. 1 at 5; ECF 366 at 29; ECF 360 at 21, 109). He expressed his frustration with another 2500 member for not taking the guns for the group, even though the member had a gun permit (Ex. 1 at 25; ECF 366 at 29, 31 (referring to him as a "little bitch"); ECF 360 at 26-27). He talked about how he tried to delete the 2500 videos off YouTube (Ex. 1 at 19; ECF 366 at 29). Mr. Burrus then commented that he wanted a gun because he was "naked out here," meaning that he needed the gun for protection against the rival's retaliation (Ex. 1 at 32; ECF 366 at 30; ECF 360 at 37). Mr. Burrus said that 2500 would never stop, that he would continue to protect his guys, and that he didn't care if there were a hundred of Mafia's members, he was still going to shoot (Ex. 1 at 50; ECF 366 at 30; ECF 360 at 47). He said, "K over everything," meaning that he was willing to kill anyone (Ex. 1 at 25; ECF 360 at 86).

A short time after the shooting, members of 2500 posted a music video online about the shooting. Messrs. Burrus, Beamon, and others appeared in a video specifically referencing the shooting on October 4, saying "fifty shots and now we hot" (ECF 366 at 18). A participant in the background of the video said something to the effect of: "[d]on't say that" or they'll know it was them who did the shooting (ECF 360 at 133). They were later charged with this offense and pleaded guilty.

The probation office issued presentence investigation reports for each defendant. The defendants first object to the application of the attempted murder guideline for counts 9, 11, and 13, which charged the defendants with attempted assault and assault in furtherance of racketeering

activity. *See* 18 U.S.C. §§ 1959(a)(3), (6). They next object to the application of the obstruction of justice enhancement. Two defendants (Messrs. Beachem and Bolden) also object to application of the multiple count adjustment in U.S.S.G. § 3D1.4, citing to their plea agreements' recommendation regarding concurrent sentencing.

The court held an evidentiary hearing regarding these objections on July 28, 2020. The government also sought to introduce grand jury testimony for the court's consideration at sentencing. The parties submitted additional briefing regarding the objections following the hearing.

DISCUSSION

A.     *Sierra Brown's Grand Jury Testimony is Admissible.*

The government seeks to introduce Sierra Brown's grand jury testimony for consideration at sentencing. She was William Beamon's girlfriend and was present at the shooting. She didn't testify at the evidentiary hearing. No defendant has objected to admission of her testimony.

The proper functioning of grand juries relies on their secrecy. *Douglas Oil Co. of Cal. v. Petrol Stops N.W.*, 441 U.S. 211, 218 (1979). This is true for several reasons: disclosure would make many prospective witnesses hesitant to come forward voluntarily when they know their testimony may be disclosed; witnesses who come forward would be less likely to be fully candid; witnesses would be susceptible to improper influence from outsiders; and persons who are accused but exonerated won't be held to public ridicule. *Id.* at 219. That said, disclosure is permitted in limited circumstances, *see* Fed. R. Crim. P. 6(e)(3), with some reluctance, *Douglas Oil*, 441 U.S. at 219. The court may disclose grand jury testimony "only in those cases where the need for it outweighs the public interest in secrecy." *Id.* at 223.

Rule 6 articulates a non-exhaustive list of circumstances when the court may disclose this testimony under the court's "inherent supervisory authority." *Carlson v. United States*, 837 F.3d 753, 763 (7th Cir. 2016). Disclosure is permitted "in connection with a judicial proceeding," Fed. R. Crim. P.

6(e)(3)(E)(i), which includes sentencing, *see, e.g.*, *United States v. McDowell*, 888 F.2d 285, 289 (3d Cir. 1989) (evidence that defendant had suborned perjured testimony in grand jury proceedings was admissible when it affected sentencing calculation); *United States v. Bravo-Fernandez*, 792 F. Supp.2d 203, 204-05 (D.P.R. 2011) (permitting disclosure to probation officers to assist them in preparation of presentence report); *United States v. Foggo*, 595 F. Supp.2d 672, 679 (E.D. Va. 2009) (permitting disclosure when it would provide information relevant to a just sentence). At sentencing, "the goals of the Sentencing Guidelines are [sometimes] best served by disclosure [of the testimony], because disclosure allows the trial judge, and before him the presentence investigator, to fully consider all of the factors [that] the Guidelines have determined to be relevant." *McDowell*, 888 F.2d at 289-90. Disclosure of Ms. Brown's testimony serves these ends.

There is a compelling need for her testimony here. It is reliable. She testified under oath. She was Mr. Beamon's girlfriend at the time of offense. She was present with gang members before, during, and after the shooting. She knew the gang members and heard their conversations, and other gang members encouraged her to claim ownership of one of Mr. Bolden's guns. *See* 18 U.S.C. § 3661; *United States v. Tankson*, 836 F.3d 873, 881 (7th Cir. 2016) (court may base sentencing decisions on reliable evidence). Time has faded the details of the events in her mind, so the most accurate recall of facts is her grand jury testimony. Her testimony is helpful in the guideline calculation as evidence for the attempted murder and obstruction of justice enhancements. It also aids the court in its 18 U.S.C. § 3553(a) analysis.

The public's interest in secrecy is minimized for many reasons. The grand jury ended their service in September 2017, so there are no concerns with any future efforts to influence this specific grand jury's investigation. Ms. Brown doesn't object to the admission of her testimony. This court's review of the testimony outside of public view and limited disclosure won't negatively impact future grand jury proceedings. *See Douglas Oil Co.*, 441 U.S. at 222 ("courts must consider not only the

immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries"). The defendants already possess her testimony, and none object. Though Ms. Brown names some unindicted individuals as 2500 members in her testimony, they are also referenced in other pieces of evidence, so any resulting harm is minimized, and ultimately the court doesn't use these references. This testimony isn't being used improperly as an instrument to aid in a civil matter.

The court finds that the usefulness of the testimony outweighs the public's interest in secrecy. Accordingly, the court grants the government's motion to consider her testimony and will do so here (ECF 356), though the grand jury testimony transcript will remain under seal.

B.    *The Court Applies the Attempted Murder Guideline for Each Defendant.*

Each defendant argues that the presentence reports incorrectly calculated their base offense level for each of their convictions for attempted assault and assault in furtherance of racketeering based on the attempted murder guideline (U.S.S.G. § 2A2.1) rather than the aggravated assault (U.S.S.G. § 2A2.2) or battery (U.S.S.G. § 2A2.3) guidelines. They say the government's decision to drop attempted murder charges because of plea bargaining forbids the court from then applying the attempted murder guideline at sentencing. *See generally* United States Sent. Comm. (USSC), *Selected Offenses Against the Person (Murder, Assault, Kidnapping) and VICAR* 33-35 (2020). Alternatively, they argue that, even if the court could apply the attempted murder guidelines in this type of scenario under certain circumstances, the facts here don't establish attempted murder.

1.    *The Real Offense, Not the Charged Offense, Governs in Determining the Base Offense Level Under U.S.S.G. § 2E1.3.*

The analysis under the sentencing guidelines starts with the offense of conviction as determined by the Statutory Index in Appendix A. U.S.S.G. § 1B1.2(a). Once the initial guideline section is determined, relevant conduct principles determine the applicable guideline range, unless the offense guideline says otherwise. U.S.S.G. § 1B1.2(b).

Violations of 18 U.S.C. § 1959 (violent crimes in aid of racketeering) are governed by U.S.S.G.

10

§ 2E1.3, which says the base offense level is the greater of either level 12 or "the offense level applicable to the underlying crime *or* racketeering activity" (emphasis added). When the underlying conduct violates state law, the court uses the offense level corresponding to the most analogous federal offense. U.S.S.G. § 2E1.3 app. n.1. One might surmise then, albeit mistakenly, that the court should apply the offense level corresponding most closely with attempted assault or assault with a dangerous weapon—the underlying charges in the indictment. *See* Ind. Code §§ 35-42-2-1(b)(1), (f)(2) (battery), 35-42-2-1.5 (aggravated assault), 35-41-5-1 (attempt), and 35-41-2-4 (aiding an offense) (2014 eds.).

Not so fast, though. This circuit interprets "underlying racketeering activity" as a cross-reference that "introduce[s] real-offense principles into the charge-offense system." *United States v. Masters*, 978 F.2d 281, 284 (7th Cir. 1992). This is precisely so because "underlying racketeering activity" speaks to "the underlying *activity* and not an underlying *conviction.*" *Id.* To determine the "underlying racketeering activity," the court looks at the whole offense, not just the offense of conviction. *Id.* at 284. The court does so even when there is an underlying conviction that would arguably fall under the state law application note. *Id.* "Often there will be no other conviction, [but] the existence of one in [a] case does not change the nature of the cross-reference." *Id.*

In *Masters*, a defendant was convicted of racketeering and conspiracy to commit racketeering. *Id.* at 283. The sentencing court used U.S.S.G. § 2E1.1, which applies to racketeering conspiracies and says the base offense level is the higher of level 19 or the "offense level applicable to the underlying racketeering activity." *Id.* The defendant argued the underlying racketeering activity was solicitation to commit murder, as charged in the indictment. *Id.* at 282-83. This circuit disagreed and upheld the application of the murder guideline (U.S.S.G. § 2A1.1)—though he wasn't charged with this offense— because the phrase "underlying racketeering activity" served as a cross-reference directing the court to look at relevant conduct to determine the real offense, not the charged offense. *Id.* at 284-85.

Later this circuit affirmed application of the first-degree murder guideline under U.S.S.G.

§ 2E1.1(a)(2) when a defendant wasn't charged with murder in the indictment. *United States v. Garcia*, 754 F.3d 460, 473-74 (7th Cir. 2014). Like *Masters*, *Garcia* involved the cross-reference to "underlying racketeering activity." *Id.* at 473. This circuit found by a preponderance of the evidence that the facts established murder as his real offense. *Id.*

To be sure, *Masters* and *Garcia* both involved racketeering (RICO) offenses under U.S.S.G. § 2E1.1, and this case involves violent racketeering (VICAR) under U.S.S.G. § 2E1.3—altogether a distinction without a difference because the language of the cross-references remains the same. Both guidelines direct the court to apply the offense level based on the "underlying racketeering activity." Both cases follow the plain meaning of the guidelines. The court does so here too. *See United States v. Hill*, 645 F.3d 900, 907-08 (7th Cir. 2011). *Masters* and *Garcia* effectively counsel the result.

Little else need be said. That ends the issue, but perhaps it proves comforting to these defendants that other circuits have reached this same result. For instance, the First Circuit applied *Masters* in reversing a district court's interpretation of "underlying racketeering activity" to apply only to the charged offense rather than the real offense. *United States v. Carrozza*, 4 F.3d 70, 75 (1st Cir. 1993). The Eighth Circuit later used these same real offense principles to interpret "underlying unlawful conduct" in U.S.S.G. § 2E1.4(a) and held that the murder guideline nonetheless applied to a defendant convicted only of traveling in interstate commerce with the intent to commit murder for hire. *United States v. Smith*, 232 F.3d 650, 651-52 (8th Cir. 2000) (*per curiam*).

The defense cites a Second Circuit decision favoring the charged offense rather than the real offense under U.S.S.G. § 2E1.3, *see United States v. McCall*, 915 F.2d 811, 814 (2d Cir. 1990), but the court must follow this circuit's law. The defense offers no reason to deviate from *Masters* or *Garcia*. And *McCall* remains unpersuasive. *McCall* properly said that the applicable guideline section must be determined by the offense of conviction, but that proves only the starting point. *McCall*, 915 F.2d at 814. *McCall* didn't consider that U.S.S.G. § 2E1.3 contains a cross-reference directing the court to

apply relevant conduct principles. *See Masters*, 978 F.2d at 284. In addition, the Second Circuit has since walked away from *McCall* on this very issue. *See United States v. Padilla*, 961 F.2d 322, 326 (2d Cir. 1992) (holding that *McCall* "cease[s] to be relevant" after the initial selection of the guideline).[8]

The defendants—without citing to any authority other than the rule itself—next argue that the phrase "acts and omissions," from the guideline governing relevant conduct, includes only physical acts. *See* U.S.S.G. § 1B1.3(a)(1). They contend that this phrase doesn't countenance a person's corresponding mental state, thus foreclosing an inference that they intended to murder the victims. Nothing within this guideline's language cogently furnishes ground to root this distinction, and the law frankly doesn't recognize it. *See, e.g.*, *Masters*, 978 F.2d at 284 (applying first-degree murder guideline based on *mens rea* of malice aforethought rather than solicitation to commit murder based on merely the intent to get another person to engage in conduct constituting a felony); *United States v. O'Brien*, 238 F.3d 822, 825-27 (7th Cir. 2001) (defendant's physical conduct in passing another motorist while driving uphill in no-passing zone supported imposition of increased base offense level on grounds that it was reckless, not just criminally negligent); *United States v. Smith*, 5 F.3d 259, 260-63 (7th Cir. 1993) (district court properly classified defendant's offense as second-degree murder when determining base offense level for unlawful possession of firearm, though not convicted for murder in state court prosecution, inferring his intent based on his physical act and because he had been warned to stop shooting and responded with a threat to kill everybody). This court has likewise not seen a distinction. *See United States v. Parker*, 1:19-CR-51, ECF 67 at 2 (N.D. Ind. Feb. 4, 2020) (applying attempted voluntary manslaughter guideline in unlawful possession of a firearm case).

Indeed, for purposes here (a determination under chapter two of the sentencing guidelines),

---

[8] *McCall*, 915 F.2d at 815, also said that applying real conduct principles would upset the parties' expectations based on the plea agreement; but that concern doesn't exist here. The parties here agreed on the statutory maximum, stipulated to most of the factual basis, and were informed that the court would make an independent judgment on the guidelines. Their plea agreements don't bind the court to a particular offense or guideline, nor did the government agree to recommend that a particular guideline would apply.

relevant conduct must be criminal conduct. *United States v. Schaefer*, 291 F.3d 932, 941 (7th Cir. 2002). Conduct generally isn't criminal absent a culpable mental state. *See Staples v. United States*, 511 U.S. 600, 605 (1994). It would thus be impossible at times to determine whether physical actions alone were relevant conduct if the court couldn't also consider the pertinent mental state (*e.g.*, crimes of attempt). *See United States v. Burns*, 781 F.3d 688, 692-93 (4th Cir. 2015) (rejecting argument that the "acts and omissions" language of U.S.S.G. § 1B1.3(a)(1)(A) encompasses only physical acts, and holding that "acts and omissions necessarily incorporate mens rea").

The defendants argue that finding an enhanced culpable mental state at sentencing results in an *Apprendi* violation. *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *see also Blakely v. Washington*, 542 U.S. 296, 301 (2004) (reaffirming *Apprendi*). Later concurring, Justice Scalia noted that the door "remains open for a defendant to demonstrate that his sentence, whether inside or outside the advisory Guidelines range, would not have been upheld but for the existence of a fact found by the sentencing judge and not by the jury." *Gall v. United States*, 552 U.S. 38, 60 (2007) (Scalia, J., concurring). The defense here says the government's argument would result in the same constitutional violation Justice Scalia envisioned.

Be that as it may, that challenge isn't compelling here. This circuit has foreclosed such an *Apprendi* challenge too. In *Garcia*, 754 F.3d at 473, the court found no *Apprendi* violation when the judge applied the murder guideline as the cross-reference in a RICO offense to justify a maximum sentence—a guideline for an offense for which the defendant wasn't charged. This circuit held that the "court was entitled to find the facts by a preponderance of the evidence, so long as those facts did not affect either the statutory maximum . . . or the statutory minimum." *Id.* (citing *Apprendi*, 530 U.S. at 466). The circuit reasoned that "[t]he district court's finding that [the defendant] should be held

accountable for the murders and attempted murders . . . did nothing more than inform its decision on the advisory guideline range and its ultimate choice of a reasonable sentence in light of the factors identified in 18 U.S.C. § 3553(a)." *Id.* Just as in *Garcia*, the court's decision here only informs it as to the recommended range within the statutory range and application of the § 3553(a) factors, so there is no *Apprendi* violation.

2. *Each Defendant Committed the Real Offense of Attempted Murder.*

The court now examines each defendant's relevant conduct to assess whether the attempted first-degree murder guideline should apply. "Murder is the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a); *see* U.S.S.G. § 2A2.1 app. n.1. Malice aforethought means that "the murderer had to have harbored before the killing a conscious intention to kill." *United States v. Delaney*, 717 F.3d 553, 555 (7th Cir. 2013). Premeditated murder is murder in the first degree. 18 U.S.C. § 1111(a); *Delaney*, 717 F.3d at 555-56. Premeditation requires that "an *appreciable* time elapse between formation of the design and the fatal act within which there is, in fact, deliberation." *Id.* (quoting *Fisher v. United States*, 328 U.S. 463, 469 n.3 (1946)). An individual attempts premeditated murder when he "intend[s] the completed crime and take[s] a 'substantial step' toward its completion." *United States v. Gladish*, 536 F.3d 646, 648 (7th Cir. 2008) (citing *Braxton v. United States*, 500 U.S. 344, 349 (1991)).

There is no mistaking each defendant's intention here. Each defendant was a member of the 2500 gang, which prided itself on violence against—and murder of—rivals. Its conflict with its rival gang was described as a "war" by one member. Each defendant appeared in music videos glamorizing this violent lifestyle, where participants carried firearms, including two with distinctive laser sights used in this shooting, or made finger trigger motions signifying gunshots. The lyrics encouraged the murder of rivals with guns as revenge for the killing of Mr. Adams, with their rivals clearly in their sights. They not only thought it out but played it out to music in full-dress rehearsal. Each defendant

15

had a substantial amount of time to ponder their involvement with the gang, and they each could have decided to disengage. They didn't but persisted toward the shooting of the rival gang's house. On this record, they did so with malice aforethought.

> a. *Demetri Beachem.*

The evidence demonstrates Mr. Beachem's intent to kill. He mimicked trigger fire with his hands in the music videos (ECF 360 at 127). He was present at the mall when the group viewed the insulting social media videos about Mr. Adams and 2500 (ECF 366 at 21-22; ECF 356-1 at 8-10). He traveled to the location where the video was filmed, looking for its makers (ECF 366 at 23). Mr. Beachem orally challenged J.S. and F.B. prior to the shooting (Ex. 2 at 3). He fired the first shot at J.S. and F.B. with a weapon that had a laser light attached to it, pointing the laser at his victims (ECF 366 at 24, 27; Ex. 2 at 3).

Following the shooting, and at a traffic stop, law enforcement found Mr. Beachem's loaded handgun in the glovebox in front of him (ECF 366 at 25). Mr. Beachem had fired at least 11 rounds from a .45 caliber pistol in the shooting (ECF 366 at 26). Mr. Beachem continued shooting at J.S., even after J.S. had dropped for cover. Mr Beachem admitted in his plea hearing that he discharged his firearm and damaged the house, acknowledging that he was intending to shoot at F.B. and J.S. (ECF 366 at 11-13). He didn't dispute the recorded statements of Messrs. Keys and Houston, which said he was present and fired a gun during the shooting (ECF 366 at 12-13).

In particular, Mr. Beachem admitted that he fired his handgun in the direction of "two figures" exiting the Suttenfield house and that he fired his handgun "intentionally knowing that the two men were in the line of fire" (ECF 335 ¶ 39). These facts alone are sufficient to establish attempted murder. *See Pigee v. Israel*, 670 F.2d 690, 695-96 (7th Cir. 1982) (inferring intent to kill is rational when a defendant shot two persons at a bar, because death is "the natural, probable, and usual consequences of such shooting").

Mr. Beachem appeared in the "Scooby Livin" video, published July 11, 2014, when he made gun-hand gestures (ECF 360 at 125-27). One of the lines in that video was "Knocking [explicit] down cause he a hitter," which means shooting at people (ECF 360 at 129). He was in the "It's Da Block" video, published November 13, 2014, with one line being "50 shots and now we're hot," referring to the approximately 50 shots fired during the shooting (ECF 360 at 132-33; ECF 366 at 18). He also appeared in other videos of a similar nature.

b. *William Beamon.*

The evidence likewise demonstrates Mr. Beamon's intent to kill. Mr. Beamon already had a violent history with rival Mafia members, admitting during a recorded conversation that he shot a Mafia member and his girlfriend in 2012, in which he "saw them fall" (ECF 366 at 18-19). He scoffed at his rival's weakness when the rival failed to respond with violence (ECF 366 at 19). He said he wanted then to kill the rival's wounded girlfriend (ECF 366 at 19). He later admitted trying to shoot at another rival on a different occasion, but his gun jammed (ECF 366 at 19). He later said members of the group like him used .40 caliber weapons at times instead of smaller weapons to be more lethal (ECF 360 at 56).

Mr. Beamon was present at the mall when the group viewed the insulting social media videos about Mr. Adams and 2500 (ECF 366 at 21-22; ECF 356-1 at 8-10). He traveled to the location where the video was filmed, looking for its makers (ECF 366 at 23). Following the shooting, and after a traffic stop, law enforcement found Ms. Brown's loaded handgun—which was used in the shooting—in the glove box directly in front of Mr. Beamon along with a high capacity magazine for the gun on the floor (ECF 366 at 25; ECF 356-1 at 21). Indeed, Mr. Beamon had encouraged Ms. Brown to buy that gun only a few weeks before the shooting and to buy a 30-round extension (ECF 356-1 at 21-23).

Mr. Beamon pulled out a gun on an "op" (opposition gang member) at a liquor store after the "op" made derogatory comments about 2500 shortly after the shooting on the same night (ECF 366

at 24; ECF 360 at 56, 102-03; ECF 356-1 at 17). He appeared in a video shortly after the shooting with the lyrics "fifty shots and now we hot" (ECF 366 at 18)—referring to the shooting at issue here and leading another participant to say "[d]on't say that" or they might be detected (ECF 360 at 133). He fired at least 12 rounds during the shooting (ECF 366 at 26).

In Mr. Beamon's plea, he admitted discharging a firearm at the victims and that, had his attempt to shoot them been successful, he would have caused serious injury or death to them (ECF 367 at 18-24). He told detectives that anyone who was with a Mafia member was fair game and was going to be in the line of fire (ECF 360 at 57). Mr. Beamon confirmed the disrespectful videos of F.B. and J.S. filmed on 2500's territory were the impetus (ECF 360 at 55-56).

Mr. Beamon admitted that he "shot at individuals, including F.B., J.S., and S.E.," which occurred "because of a rivalry between the 2500 gang and [the Mafia]" (ECF 318 ¶ 39). He acknowledged that the shooting "happened because of the gang rivalry, revenge and a desire to protect territory and promote the position of the 2500 gang" (ECF 318 ¶ 39). These facts are sufficient to apply the attempted murder guideline. *See Pigee*, 670 F.2d at 695-96.

Mr. Beamon appeared in 2500's videos "Ain't Got Time For That" (published February 17, 2014) and "Move Around" (published June 12, 2014). In each, he was holding a handgun with an extended magazine; the videos discussed shooting and killing rivals (ECF 360 at 113-16, 119). He appeared in the "Scooby Livin" video (published July 11, 2014) and "Zan with the Lean" (published August 21, 2014), both of which referred to shooting and killing others (ECF 360 at 125-26, 129, 131-32). Mr. Beamon recited lyrics specifying that "ops" would be killed with gunfire and that people would know their group's name based on its violent activities (ECF 329 ¶ 11). He was in the "It's Da Block" video (published November 13, 2014) with one line being "50 shots and now we're hot" (ECF 360 at 132-33)—again glamorizing this very shooting and their intent to kill opposition gang members. He also appeared in many other videos of a similar nature. As a whole, these videos contained firearms

with laser pointers, threats of shooting at the opposition, and finger simulations of shooting at others—reflections of an intent on which he then acted.

### c. *Kyombe Bolden.*

The evidence demonstrates Mr. Bolden's intent to kill. He was present at the mall when the group viewed the insulting social media videos about Mr. Adams and 2500 (ECF 366 at 21-22; ECF 356-1 at 8-10). He traveled to the location where the video was filmed, looking for its makers (ECF 366 at 23). He fired at least 3 rounds from his .40 caliber Ruger in the shooting (ECF 366 at 26). Mr. Bolden admitted shooting and discharging his firearm at F.B. and J.S. (ECF 329 ¶ 40).

Mr. Bolden appeared in the "Move Around" (published June 12, 2014) (Tr. 122), "Taxin" (published June 20, 2014), and "Zan with the Lean" (published August 21, 2014) videos, each of which referenced shooting and killing rivals (ECF 360 at 122, 124, 129, 131-32). Mr. Bolden recited lyrics specifying that opposition gang members would be killed with gunfire and that people would know their group's name based on its violent activities (ECF 329 ¶ 11). He appeared in other videos of a similar nature. As a whole, these videos contained firearms with laser pointers, threats of shooting at the opposition, and finger simulations of shooting at others. These facts sufficiently warrant the attempted murder guideline. *See Pigee*, 670 F.2d at 695-96.

### d. *Ronnie Burrus.*

Ronnie Burrus was present at the mall when the group viewed the insulting social media videos about Mr. Adams and 2500 (ECF 366 at 21-22; ECF 356-1 at 8-10). He traveled to the location where the video was filmed, looking for its makers (ECF 366 at 23). Mr. Burrus admitted he was almost involved in another shooting with Mafia members that same night at another liquor store and said he would have shot at them had they not been armed (ECF 360 at 38). He later said he wasn't leaving Fort Wayne until he "[caught] a body" (Ex. 1 at 5; ECF 366 at 29; ECF 360 at 21, 109). He said he wanted a gun because he felt "naked out here," meaning he wanted a gun for protection against

retaliation from rivals (Ex. 1 at 32; ECF 366 at 30; ECF 360 at 37). He said 2500 would never stop, that he would continue to protect his guys, and that he didn't care if there were a hundred of Mafia's members, he was still going to shoot (Ex. 1 at 50; ECF 366 at 30; ECF 360 at 47-48).

Mr. Burrus also said "K over everything," which meant that he was willing to kill anyone (Ex. 1 at 25; ECF 360 at 86). He appeared in a video shortly after the shooting in which he said "fifty shots and now we hot" (ECF 366 at 18)—again glamorizing the shooting and leading another participant to say "[d]on't say that" or they might be detected (ECF 360 at 133). He admitted pointing his red beam at the victims while shooting at them (Ex. 1 at 28; ECF 360 at 86). Mr. Burrus was also motivated by the fact that F.B. had previously "snitched on" him (Ex. 1 at 14; ECF 360 at 28).

He appeared in the "Move Around" (published June 12, 2014), "Taxin" (published June 20, 2014), "Scooby Livin" (published July 11, 2014), and "Zan with the Lean" (published August 21, 2014) videos, each of which referenced shooting and killing rivals. (ECF 360 at 122, 124-26, 129, 131-32). Mr. Burrus recited lyrics specifying that ops would be killed with gunfire and that people would know their group's name based on its violent activities (ECF 329 ¶ 11). He was in the "It's Da Block" video (published November 13, 2014) where he sang "50 shots and now we're hot" in reference to the shooting (ECF 360 at 132-33). This video had a firearm with a red laser beam like the one used in the shooting (ECF 360 at 133). Mr. Burrus can be heard throughout other videos saying things like "fuck the ops" and threatening violence against them. As a whole, these videos contained firearms with laser pointers, threats of shooting at the opposition, and finger simulations of shooting at others.

In addition to these acts and this evidence of intent, the defendants took substantial steps in attempting these murders. A substantial step is an "overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime." *United States v. Sanchez*, 615 F.3d 836, 844 (7th Cir. 2010) (quotation omitted). The overt acts consisted of the following: each of the defendants chose to get into a vehicle and go to the shooting scene, motivated

by Mafia's disrespect; they each chose to carry a loaded weapon; each willingly fired multiple bullets aimed at the victims in the dark. In the ordinary and likely course of things, these overt acts would result in the death of the victims. *See id.* at 844-45. Here, the bullets sprayed houses occupied by people and vehicles. One victim was hit in the finger by a bullet. Bullets narrowly missed others.

The defendants admitted shooting at the house, but they argue that they didn't intend to hit the victims and thus didn't attempt first-degree murder. They say this is evinced by the firing of fifty bullets, all of which missed their targets. The court isn't persuaded. That the defendants fired fifty bullets at the victims without hitting them shows poor marksmanship in the dark, not an intention to miss. It was a highly probable result of shooting fifty bullets in the direction they did that at least one of the opposition gang members would be hit and killed. The court chooses to take the defendants at their own word that they intended to kill these "ops."

In sum, there is overwhelming evidence implicating each individual defendant for attempted murder. The court applies the attempted murder guideline for counts 9, 11, and 13 pursuant to U.S.S.G. § 2E1.3.

C.    *The Obstruction of Justice Enhancement Applies as to Messrs. Beamon, Burrus, and Bolden, but not to Mr. Beachem.*

The presentence investigation reports assessed the obstruction of justice enhancement as to Messrs. Beamon, Bolden, and Burrus. It wasn't assessed to Mr. Beachem (ECF 335 ¶ 37), but the government argues it should be. Each defendant says the enhancement shouldn't apply to him.

The two-level obstruction of justice enhancement applies if:

(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . .

U.S.S.G. § 3C1.1. This circuit has held that the enhancement applies when a defendant "counsel[s] a potential witness to make false statements to investigating authorities," *United States v. Lanzotti*, 205

F.3d 951, 957 (7th Cir. 2000) (applying enhancement when defendant encouraged bar owners to lie to the IRS about their payment arrangement with defendant's company), so long as the false statements have a material impact on the investigation, U.S.S.G. § 3C1.1 app. n. 4(G) & app. n.5(B).

The enhancement applies as to Mr. Beamon and Mr. Burrus. A recorded conversation with an informant showed both these defendants were active participants in getting Ms. Brown to retrieve the guns, with Mr. Burrus appearing to be a leader in the effort (Ex. 1 at 3, 12), which was important evidence based on the ballistics results (ECF 360 at 22, 30; Ex. 1 at 21 (Mr. Burrus: "she got seventy-two hours to go down there and say it's hers")). Law enforcement seized the guns as evidence regarding the shooting (ECF 356-1 at 25-26). Mr. Burrus wanted Ms. Brown to write out a notarized statement claiming the guns were hers, with the goal being the dismissal of charges against Mr. Bolden (ECF 356-1 at 29). Mr. Burrus asked the informant to "coach her" on how to retrieve the gun (Ex. 1 at 62; ECF 320 ¶ 27) and accompanied Ms. Brown—along with Mr. Beamon—at the police station (ECF 360 at 51). Ms. Brown said Mr. Beamon also made direct statements to convince her to claim Mr. Bolden's gun too (ECF 356-1 at 28). Their encouragement of Ms. Brown was aimed at impeding the investigation of this case (ECF 360 at 34-35, Ex. 1 at 22 ("He got seventy-two hours or the, or the Feds gonna pick it up."), 23, 24, 26, 32, 35).

While Mr. Bolden was on a phone call with Mr. Beamon and Mr. Burrus when they discussed their plans for Ms. Brown, he never said he wanted Ms. Brown to lie to law enforcement (ECF 360 at 81). Ordinarily, then, he wouldn't receive this enhancement. The government concedes this point, but argues under U.S.S.G. § 1B1.3(a)(1)(B) that Mr. Beamon's and Mr. Burrus' efforts to obstruct justice should be imputed to him.

The guideline says that in a jointly undertaken criminal activity, acts that were (1) within the scope of the joint criminal activity; (2) in furtherance of that criminal activity; and (3) reasonably foreseeable in connection with that activity, which occur in the course of attempting to avoid detection

for that offense, may be counted as relevant conduct as to a particular defendant. U.S.S.G. § 1B1.3(a)(1)(B); *see United States v. Dean*, 574 F.3d 836, 844-45 (7th Cir. 2009). In applying § 1B1.3(a)(1)(B), the court must first "make a preliminary determination of the scope of the criminal activity the defendant agreed to jointly undertake." *United States v. Salem*, 597 F.3d 877, 886 (7th Cir. 2010). Then "the court must make a two-part determination of whether the conduct of others was *both* in furtherance of that joint criminal activity *and* reasonably foreseeable to the defendant in connection with the joint criminal activity." *Id.*

Here, the scope of the criminal activity for which Mr. Bolden agreed to jointly undertake was, on a narrow scale, the attempted murders, and on a broader scale, the furtherance of 2500's goals and objectives, which after the shooting included the scheme related to the firearms. Messrs. Burrus' and Beamon's conduct occurred within the scope of this joint criminal activity. It also furthered the joint criminal activity, as it would have helped the defendants and other gang members evade detection. Mr. Bolden knew of these plans. He participated as a privy to this joint criminal activity, so it was reasonably foreseeable to him that the attempted obstruction would occur and for his benefit. Accordingly, the court applies the enhancement to Mr. Bolden.

The government argues that this enhancement should also apply to Mr. Beachem. On this record, he wasn't involved in the group's efforts to recruit Ms. Brown to obstruct justice. The government concedes this point, but again says the enhancement should apply as jointly undertaken criminal activity (U.S.S.G. § 1B1.3(a)(1)(B)). Messrs. Burrus' and Beamon's conduct furthered the joint criminal activity. Unlike Mr. Bolden, though, Mr. Beachem couldn't reasonably foresee that Mr. Beamon and Mr. Burrus would engage in these efforts, as he had no part in these discussions. For all he knew, at least on this record, the gang had decided to leave things as they were without interfering days after the shooting. Accordingly, the court doesn't apply the enhancement for Mr. Beachem.

D.      *The Court Overrules Messrs. Beachem and Bolden's Objection to the Application of the Multiple Count Adjustment in U.S.S.G. § 3D1.4.*

Messrs. Beachem and Bolden object to the application of the multiple count adjustment in U.S.S.G. § 3D1.4. This guideline directs the court to add offense levels when multiple offenses are grouped together under the guidelines, resulting in a higher sentencing range. *See* U.S.S.G. § 3D1.4. Messrs. Beachem and Bolden say that this guideline conflicts with their plea agreement provision that Counts 9, 11, and 13 should run concurrently, arguing that a plain meaning of "concurrent" would have the sentence for all three counts calculated separately and then served simultaneously such that the most serious count would control. The court disagrees.

Neither Messrs. Beachem nor Bolden cite to any authority supporting their argument. Both plea agreements say Counts 9, 11, and 13 must run concurrently pursuant to U.S.S.G. § 5G1.2(c), and the specific reference to the guidelines necessarily incorporates the steps required to properly determine their sentencing range. U.S.S.G. § 1B1.1 says multiple count adjustments in § 3D all apply prior to determining the guideline range and the sentencing requirements in parts B through G of Chapter 5. *See* U.S.S.G. § 1B1.1(a). Offenses may still run concurrently even if the guidelines' grouping rules recommend a higher sentence because of multiple underlying convictions. Applying § 3D1.4 here doesn't violate their plea agreements.

CONCLUSION

In the course of committing the crimes listed in the indictment, each defendant attempted the murder of J.S. and F.B. The guidelines direct the court to apply the attempted murder guideline for each defendant for counts 9, 11, and 13 as a cross reference under U.S.S.G. § 2E1.3.

The obstruction of justice enhancement applies as to Messrs. Beamon, Bolden, and Burrus, but does not apply as to Mr. Beachem.

The multiple count adjustment (U.S.S.G. § 3D1.4) applies to all defendants.

The court grants Mr. Beamon's (ECF 361) and Mr. Bolden's (ECF 363) motions to seal and

grants the government's motion to consider grand jury testimony (ECF 356).

Individual sentencing hearings will be scheduled forthwith.

SO ORDERED.

March 19, 2021                              s/ Damon R. Leichty
                                           Judge, United States District Court